## Charlotte A. Justis v. Gilbert W. Rist

[617 A.2d 148]

No. 91-297

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 18, 1992

*James W. Murdoch* of *Wool, Murdoch & Hughes*, Burlington, for Plaintiff-Appellee.

*Lloyd A. Portnow, Samuel H. Press* (Of Counsel), and *Ira N. Morris*, Law Clerk, of *Portnow, Little & Cicchetti, P.C.*, Burlington, for Defendant-Appellant.

**Johnson, J.** This appeal from a divorce order presents the issue of whether the family court has the authority to order the estate of the obligor spouse to continue maintenance payments in the event the obligor predeceases the recipient spouse. We conclude that Vermont statutory law provides no such authority, and, accordingly, vacate the family court's order and remand the case for further proceedings.

The parties married in 1977, four months after they had met. It was the first marriage for the 62-year-old husband and the fourth for the 48-year-old wife. During the entire thirteen-year marriage, the parties kept separate finances, resided in different states, and were apart except for approximately four months.

The wife requested a property settlement in lieu of maintenance, but the court felt that "in light of the unique nature of this marriage, [the wife's] needs are better met through a maintenance award." The court indicated that a property settlement was not appropriate because the husband had acquired most of his property, valued at about $500,000, long before the marriage. Further, the court stated that it wanted to ensure reasonable support for the wife during her life without creating a windfall for her estate if there were a large property settlement and the wife, whose health was precarious, died soon thereafter.

Accordingly, the court ordered the husband to pay the wife $40,000 in a lump-sum property settlement and $1600 per month in permanent maintenance, said maintenance to cease "only upon the death of the Plaintiff and . . . [to] be otherwise payable from the estate of the Defendant should he predecease her." The court further ordered that a lien in the sum of $180,000 be placed on the husband's real estate to secure the maintenance payments. In support of its authority to order post-mortem maintenance, the court noted that Vermont law gives the family court broad discretion in fashioning maintenance awards, and that other jurisdictions with statutes similar to Vermont's had ruled that the courts could order maintenance to continue beyond the death of the obligor spouse. The husband appeals from that ruling.

■ Vermont's maintenance statute, 15 V.S.A. § 752, authorizes the trial court to order either spouse to make rehabilitative or permanent maintenance payments if the other spouse lacks sufficient income to meet reasonable needs and is unable to maintain the standard of living established during the marriage. The payments "shall be in such amounts and for such periods of time as the court deems just, after considering all relevant factors." § 752(b). One of the factors listed is "the ability of the spouse from whom maintenance is sought to meet his or her reasonable needs while meeting those of the spouse seeking maintenance." § 752(b)(6). Once the court has found grounds for awarding maintenance, "it has broad discretion in determining the duration and amount" of the award. *Chaker v. Chaker*, 155 Vt. 20, 25, 581 A.2d 737, 740 (1990).

■ Despite the trial court's broad discretion to fashion maintenance awards, no statutory language expressly authorizes the court to continue maintenance beyond the death of the obligor. Whether the failure to address the issue of post-mortem maintenance was by design or omission is not apparent from the language of the statute itself. One of the few clues we have in the statute is that the trial court must consider the reasonable needs of the obligor spouse when awarding maintenance. This indicates that the legislature assumed the payments would be coming from the obligor personally rather than from the estate. On the other hand, § 752 authorizes the court to order "permanent" maintenance, which some may argue shows the legislature's intent to allow maintenance to be measured by the death of the recipient. But "permanent" maintenance has traditionally been construed to be an indefinite award that ends with the death of either spouse or the remarriage of the recipient spouse. 2 H. Clark, The Law of Domestic Relations § 17.5, at 264 (2d ed. 1987).

Because the statutory language is inconclusive on intent, we consider the context in which § 752 was amended and the state of the law on post-mortem maintenance at that time. Section 752 was amended in 1982 as part of the legislature's general reform of divorce and support law in this state. See 1981, No. 247 (Adj. Sess.). Many of the new provisions, including § 752, follow closely the Uniform Marriage and Divorce Act, 9A U.L.A. 147 (1987) (Uniform Act). For example, both § 752 and

§ 308 of the Uniform Act state that the maintenance order shall be in amounts and for such "periods of time" as "the court deems just." The legislature, however, did not adopt § 316(b) of the Uniform Act, which states, in relevant part, that the obligation to pay maintenance terminates upon the death of either party unless the parties agree, or the court expressly orders otherwise.

At the time § 752 was enacted, the generally accepted common-law rule was that the obligation to pay maintenance ceased upon the death of either party. See, e.g., *Aldrich v. Aldrich*, 163 So. 2d 276, 278–79 (Fla. 1964); *Funnell v. Funnell*, 584 P.2d 1319, 1322 (Okla. 1978). The rationale for the rule was that a former spouse receiving maintenance could not have "a greater right to support from the obligated spouse than if the parties had remained married and the obligated spouse died." *Chaney v. Chaney*, 343 Pa. Super. 77, 83, 493 A.2d 1382, 1386 (1985). Another rationale was that, because maintenance compensates for the support from future income that would have been available but for the divorce, the right to it ends along with the income-earning capacity of the obligor. *Estate of Kuhns v. Kuhns*, 550 P.2d 816, 817 (Alaska 1976).

In many jurisdictions the common-law rule has been replaced by statutes, including those modeled after § 316 of the Uniform Act, that specifically state whether maintenance may be continued beyond the death of the obligor. The courts in jurisdictions without explicit statutory language are divided on whether such authority may be derived from a general statute, like § 752, which gives the courts broad discretion to fashion maintenance awards. Compare *Ehrler v. Ehrler*, 69 Misc. 2d 234, 235, 328 N.Y.S.2d 728, 729 (Sup. Ct. 1972) (because statute contains no language expressly authorizing continuance of alimony after obligor's death, alimony terminates upon obligor's death)*; *McCune v. McCune*, 284 S.C. 452, 455, 327 S.E.2d 340, 341 (1985) (family court exceeded its authority in ordering periodic alimony payments to continue after obligor's death), with *In re*

---

* New York law now provides that "an award of maintenance shall terminate upon the death of either party." See *Keehn v. Keehn*, 137 A.D.2d 493, 495–96, 524 N.Y.S.2d 238, 241 (1988) (quoting Domestic Relations Law § 236(B)(1)(a)).

*Estate of Gustafson*, 287 N.W.2d 700, 701–02 (N.D. 1980) (statute permitting court to make maintenance award as "may seem just" authorized continued payments during life of recipient spouse after obligor's death); *Prather v. Prather*, 172 W. Va. 348, 352, 305 S.E.2d 304, 309 (1983) (divorce court had power to make award of alimony payments binding on obligor's estate where statute empowered court to make award that it deemed expedient concerning the estate and maintenance of the parties). See generally Annotation, *Death of Obligor Spouse as Affecting Alimony*, 79 A.L.R.4th 10 (1990).

Given the absence of statutory language expressly authorizing post-mortem maintenance, the legislature's failure to adopt § 316 of the Uniform Act which authorized courts to order such payments, and the common-law rule proscribing post-mortem maintenance, we will not assume the legislature intended § 752 to override the generally accepted and long-established rule that the obligation to pay maintenance ceases upon the death of either party. See *O'Brien v. Island Corp.*, 157 Vt. 135, 140, 596 A.2d 1295, 1298 (1991) (we must presume legislature did not intend to overturn a long-established principle of law unless such an intention is clear); cf. *Johnson v. Martin*, 567 A.2d 1299, 1304 (D.C. App. 1989) (enactment of statute based on another law, but different in one or more provisions, shows intent not to follow the law in that regard). To do so would amount to judicial legislation. *Aldrich v. Aldrich*, 163 So. 2d at 280; cf. *In re Marriage of Koktavy*, 44 Colo. App. 305, 306, 612 P.2d 1161, 1162 (1980) (legislature's adoption of § 316 of Uniform Act changed prior supreme court holding that divorce courts do not have authority to award alimony after obligor's death). Accordingly, we hold that the courts have no authority to order maintenance to continue beyond the life of the obligor spouse unless the parties have agreed otherwise.

This is not to endorse the notion, as a matter of policy, that post-mortem maintenance awards should not be allowed by statute. To the contrary, it is precisely because we recognize the compelling policy considerations both in favor of and against post-mortem maintenance that we choose to leave this decision to the legislature. 2 H. Clark, The Law of Domestic Relations § 17.6, at 292–93 (there remains substantial conflict among states over whether courts should have authority to order ali-

mony to continue after obligor's death, but the continuation of maintenance in most cases causes hardship, inconvenience and expense to the decedent's second family). Compare *In re Estate of Gustafson,* 287 N.W.2d at 701 (common-law rationale, that no longer exists, for denying maintenance after death of obligor was that divorce did not fully terminate marriage so wife retained interest in her husband's estate), with *Funnell v. Funnell,* 584 P.2d at 1324 (unless recipient spouse is a lawful creditor of the decedent pursuant to property or contract rights, that spouse should not be placed in a status that undercuts the decedent's second family, who have no legal duty to support); *Estate of Kuhns v. Kuhns,* 550 P.2d at 818 (continuance of maintenance in most cases causes hardship to those closer to husband such as second wife and children of second marriage). Unlike the Court, the legislature is able to consider all the policy ramifications that flow from a major change in the law and to harmonize other statutes, such as those on the administration of estates, if necessary, to effectuate new policy.

We need determine here only whether the legislature, by enacting § 752, intended to give the courts the authority at issue in this case. We conclude that it did not.

Because our law requires the court to consider the property division and maintenance in conjunction with each other, see 15 V.S.A. § 751(b)(7) and § 752(a)(1), the property division must be vacated to allow the court leave to revise it, if necessary, and fashion an appropriate order consistent with the circumstances of this case. *Downs v. Downs,* 154 Vt. 161, 168, 574 A.2d 156, 159 (1990).

*The provisions of the May 24, 1991 divorce order dividing the parties' property and awarding maintenance are vacated; in all other respects, the order is affirmed. The matter is remanded for further proceedings consistent with this opinion.*

**Morse, J.,** dissenting.\* I cannot agree with the Court's conclusion that 15 V.S.A. § 752(a) does not provide a court with

---

\* Because the majority has held that the court was without authority to continue maintenance beyond the obligor's death, we need not reach whether it was an abuse of discretion to order maintenance to continue beyond the obligor's death in this case. Thus, I do not necessarily dissent to the result although I disagree with the reasoning.

authority to award postmortem maintenance payments absent an agreement. I find no language in 15 V.S.A. § 752 limiting the family court's discretion in fashioning an order to achieve equitable results. The statute is silent on the possibility for maintenance from the former spouse's estate. The Court's construction of the statute injects a prohibition that simply does not exist. See *Johnson v. Johnson*, 155 Vt. 36, 42, 580 A.2d 503, 507 (1990) (remarriage, unmentioned in § 752, does not terminate maintenance as a matter of law).

In my view, the sounder approach is to focus on what the law does say, rather than on what it does not. Vermont's statute on maintenance allows a court to "order either spouse to make maintenance payments, either rehabilitative or *permanent* in nature, to the other spouse." 15 V.S.A. § 752(a) (emphasis added). An order for maintenance "shall be . . . for such periods of time as the court deems just, after considering all relevant factors," including the factors listed in 15 V.S.A. § 752(b)(1)–(7). 15 V.S.A. § 752(b). What could be simpler? The Court's reasoning runs counter to the statute's purposes and plain meaning, and the holding narrows the enactment by judicial amendment.

Not too long ago we held that a medical degree, with its attendant earning capacity, is not marital property under 15 V.S.A. § 751. *Downs v. Downs*, 154 Vt. 161, 165, 574 A.2d 156, 158 (1990). Yet in *Downs* we recognized that Vermont's maintenance statute, § 752, is "sufficiently flexible" to allow a court to consider future earning prospects of the student spouse. *Id.* at 166, 574 A.2d at 159. After today's decision, § 752 is not as flexible as I had thought, and I find no compelling reason to restrict a flexible approach.

The explicit, specified, statutory criteria are eviscerated to give effect to a criterion not expressed in the statute at all. All seven of the statute's "relevant factors" are defeated to enhance the inheritance of a *second family*, a factor nowhere mentioned in the statute. In fact, today's ruling reduces the receipt of § 752 maintenance, permanent or rehabilitative, to a mere gamble contingent upon the vicissitude of an untimely death. I cannot believe the Legislature intended such misfortune.

The facts here—emphasized for effect but irrelevant to the holding—are not a particularly compelling foundation on which to build a permanent maintenance award. Yet, there are situa-

tions that would be compelling. For instance, suppose the wife in a thirty-year marriage had been the homemaker and chief caretaker for the children rather than pursuing a more economically gainful career. Suppose also that, at the time of divorce, the husband had a medical condition preventing him from procuring life insurance and his wife's life expectancy was significantly greater than his. Given the inflexibility of today's ruling, it would indeed tax a family court's imagination to protect the wife from taking an economic plunge should the husband die and maintenance stop. Perhaps a trust could be established with marital assets. See *Naumann v. Kurz*, 152 Vt. 355, 357–58, 566 A.2d 1342, 1343 (1989) (trust created from which spouse requesting maintenance received income). Transferring a disproportionately larger share of marital property to the wife, however, may not be a fair way to protect her for the reason put forth by the Court in prohibiting postmortem maintenance— the husband's potential estate would be reduced by an unfair imbalance in assets distributed to the parties. Even if insurance on the husband's life for the benefit of the wife were possible, today's holding puts that alternative in doubt as an artful ploy to bypass the lack of authority to grant postmortem maintenance. See *Chaker v. Chaker*, 155 Vt. 20, 23–24, 581 A.2d 737, 739 (1990) (provision requiring husband to maintain wife as sole beneficiary of life insurance policy unchallenged); *Quesnel v. Quesnel*, 150 Vt. 149, 152, 549 A.2d 644, 647 (1988) (where insurance policy is already in effect, court has authority to order insured party to maintain policy for benefit of spouse).

No rationale supports the reading that a permanent award of maintenance ends, as a matter of law, when the obligor dies long before his time, and the one in need lives on. In fact, as one commentator has pointed out, this rule "basically penalizes women because they statistically live longer than men." Note, *Alimony, Till Death Do Us Part*, 27 J. Fam. L. 859, 860 (1989). No word or phrase in § 752, no policy, no rule of statutory construction, justifies such a senseless outcome.

The Court's primary rationale for its position rests on factor (6): "the ability of the spouse from whom maintenance is sought to meet his or her reasonable needs while meeting those of the spouse seeking maintenance." According to the Court, this indicates that "the legislature assumed the payments would be

coming from the obligor personally rather than from the estate." But that assumption is just as farfetched as the assumption that a property distribution under § 751 must be accomplished before a party dies, or it is lost.

Furthermore, the Court's comparison of § 752 with the Uniform Marriage and Divorce Act explains little about the underlying legislative intent. The Legislature's failure to adopt § 316(b), which states that the obligation to pay maintenance terminates upon the death of either party unless the parties agree, or the court expressly orders, cannot be a basis for concluding that Vermont's statute, allowing for *permanent* maintenance, does not authorize awards of postmortem maintenance. If any significance is given to the failure of the Legislature to adopt § 316(b), the stronger logical inference is that permanent maintenance extends beyond the death of the obligor when no time limit is specified in the judgment. Otherwise, following the Court's reasoning to its logical extreme would result in a prohibition on postmortem maintenance even when the parties agree to it.

In my view, Vermont law on domestic relations provides ample guidance in determining the goals of the Legislature. The factors contained in § 752 guide the court in examining the parties' present and potential financial situation, based on their resources, abilities and needs, in fashioning a maintenance award. 15 V.S.A. § 752(b)(1)–(2),(5)–(6). This consideration also provides recompense for the nonfinancial contributions of a homemaker to the family's well-being, and promotes financial status quo by allowing the parties to achieve the same standard of living established during marriage. *Klein v. Klein*, 150 Vt. 466, 474, 555 A.2d 382, 387 (1988); see 15 V.S.A. § 752(b)(3)–(4). In sum, the statutory scheme protects the divorcing spouse with the lower income-producing capability from suffering a disproportionately diminished life-style after divorce. The Court, however, dilutes this protection and eliminates it in some cases. We have legislated out of existence a measure of protection the Legislature intended to include for the least economically viable party after divorce.

The Court acknowledges that there are "policy considerations both in favor of and against post-mortem maintenance." Nevertheless, it opts for the rule that prefers potential benefici-

aries of the payor's estate over the real needs and deserved benefits of a living ex-spouse *in every case*, rather than balancing those policy considerations on a case-by-case basis. The statutory scheme, however, does not seek to apportion financial equity according to a hierarchy of people "closest" to the ex-spouse. Although consideration for the payor's most current family may be one factor in allotting resources, it should not be the only element. If the terms of the divorce order prove to be unduly burdensome, an aggrieved party may bring a motion to modify maintenance under 15 V.S.A. § 758. See *Scott v. Scott*, 155 Vt. 465, 470, 586 A.2d 1140, 1143 (1990) ("vagaries of the future" adequately addressed by modification procedure); *Johnson*, 155 Vt. at 42, 580 A.2d at 506 (if period for alimony payments "proves too short or too long, the disadvantaged party can seek modification"). Furthermore, if, at the time of the divorce, there are adequate funds, then mechanisms such as life insurance and annuities should be used to allow periodic disbursement, which would not unduly encumber administration of the estate.

As the Court points out, the decisions from other states are based on an archaic common-law rule that is inconsistent with modern rationales for the award of maintenance. See, e.g., *In re Estate of Gustafson*, 287 N.W.2d 700, 701 (N.D. 1980) (under common-law, divorced wife retained interest in ex-husband's estate, justifying termination of maintenance after his death). Thus, we are blindly accepting an outmoded construction of the statute rather than following the wisdom of allowing trial courts to devise equitable outcomes based on *all* the circumstances. This is regrettable, because the Court's reliance on un-enlightened out-of-state precedent departs from our consistent trend of fostering equitable allocation of resources following divorce. I am reminded of Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 469 (1897), where he said,

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Because I believe that the statutory authority afforded by 15 V.S.A. § 752 supports the trial court's ruling, I respectfully dissent. Justice Dooley joins in this dissent.