NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 58

No. 2016-306

| | |
|---|---|
| Nicola Weaver | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Family Division |
| | |
| David Weaver | February Term, 2017 |

Samuel Hoar, Jr., J.

Paul R. Morwood, South Burlington, for Plaintiff-Appellant.

Wanda Otero-Weaver, Lincoln, for Defendant-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund and Eaton, JJ., and Cohen, Supr. J.,
Specially Assigned

¶ 1. **EATON, J.** Wife, Nicola Weaver, appeals the trial court's order granting a motion filed by husband, David Weaver, to modify his spousal maintenance obligation. Wife argues the trial court erred in three ways: by (1) reducing her spousal support to zero; (2) inaccurately calculating husband's actual living expenses because the court declined to consider husband's current wife's financial support of husband; and (3) allowing a credit for overpayment of spousal maintenance against a child support arrearage. We agree with wife that the trial court erred on these three points of law and therefore reverse and remand.

¶ 2. The parties were divorced in August 2011. At the time of the divorce, they had been married for sixteen years and had four children. Wife was fifty years old and husband was

forty-three years old. The trial court that presided over their divorce proceedings ordered husband to pay wife $2916 per month in spousal maintenance and explained that the award was intended to help wife meet her needs, but that it also had a "compensatory aspect" based on the court's finding that "[husband] wouldn't be doing as well as he is unless [wife] was the primary caregiver for the children." The court did not explain how much of the monthly maintenance award constituted the "compensatory aspect." The court ordered husband to pay spousal maintenance "until [husband's] death, [wife's] death or remarriage or her full retirement and commencement of drawing pension payments and any social security to which she may be entitled."

¶ 3.     In September 2013, the court granted a motion filed by husband seeking to modify his maintenance obligation because of changed financial circumstances. Husband testified that he lost a major client, which significantly reduced his income, so the court reduced husband's spousal maintenance obligation to $2500 per month, retroactive to July 2013. In October 2014, husband filed a second motion to further modify spousal maintenance on the basis that he had recently become unemployed. The court held a hearing on husband's second motion to modify over a three-day period in 2015. On July 29, 2015, the trial court concluded that husband's involuntary termination from employment amounted to a substantial change of circumstance under 15 V.S.A. § 758 and reduced husband's spousal maintenance obligation to $1500 per month, retroactive to the date he filed the motion to modify, October 29, 2014.

¶ 4.     The relevant factual findings from the hearings on husband's September 2013 and October 2014 motions are as follows. In 1998, the parties and their minor children moved to Vermont. At the time of their move, wife was earning the equivalent of $40,000 per year, and husband was earning $27,000 per year. Once they moved to Vermont, wife stayed at home to care for the children—three of whom were under the age of three and all four of whom were under the age of seven—while husband continued to work outside the home. At the time of the divorce,

husband was making $101,688 per year and wife about $18,198 per year. In the final divorce order, the court required husband to pay $2916 each month in spousal maintenance to wife. The final divorce decree stated that spousal maintenance would "help to meet [wife's] shortfall and enable her to catch up."

¶ 5. In 2013, husband settled a claim for future lost earnings that paid him $202,692. Husband admitted by stipulation that he failed to disclose this information during a hearing on his first modification motion and that his maintenance obligation therefore should not have been modified. Based on this new information, the court reinstated husband's spousal maintenance obligation at the original amount of $2916 per month for the period between July 2013 and October 2014, pending an evidentiary hearing on the motion. The court found that husband's unemployment was "a temporary situation" and that he would likely be able to meet his own needs and provide the modified $1500 per month maintenance payment. The court also found that wife continued to lack sufficient income to provide for her reasonable needs and would likely be unable to sustain the standard of living established during the marriage. The court calculated total spousal arrearages of $8640 through May 31, 2015, and ordered a judgment in favor of wife in that amount.

¶ 6. In February 2016, husband appealed that modification order to this Court, and we reversed and remanded. Weaver v. Weaver, 2015-326, 2016 WL 562907, at *1 (Vt. Feb. 1, 2016) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents/eo15-326.pdf [https://perma.cc/JK8S-KDLF]. On remand, the court found the following facts. In September 2015, husband was employed as a Building Automation sales representative, with a salary of $55,000. He was receiving residual checks in the amount of $880 per month that would gradually decrease to zero. The trial court calculated his present income, as of August 2016, at $5463.33 per month, expected to decrease to $4583.33 per month. The court found husband owed the Internal Revenue Service approximately $50,000 and the State of Vermont $14,000 for delinquent income

3

taxes. The court also found that the settlement money husband received in 2013 was spent reasonably and before he had any reason to expect becoming unemployed.

¶ 7. Husband shares a home in Monkton with his present wife, her three children and two of his children. At the modification hearing on remand, wife emphasized that husband's present wife subsidizes his expenses to the extent of $5145 per month and sought to inquire into her income. However, the court sustained husband's objection limiting the inquiry to husband's current wife's ability to meet her agreed-upon half of the household expenses.

¶ 8. The court found that husband's expenses exceeded $5000 per month, which included half of the household expenses generated by his new family and which the court characterized as his "fair share" of the expenses. He and his current wife had an agreement between them that each would be responsible for half of the household expenses. The court did not include husband's tax liabilities, expenses for the parties' children, or child support payments in its calculation of his reasonable monthly expenses. The court found that the house he shares with his present wife was his only source of equity.

¶ 9. Because the court found that husband's reasonable expenses exceeded his income, it concluded that he could not be required to pay spousal maintenance in any amount and reduced his obligation to zero, retroactive to October 29, 2014. The court's order characterized the maintenance order as completely "compensatory," but it nevertheless weighed the equities and reduced husband's obligation to zero. Under the August 2016 order, husband was entitled to a return of funds paid since October 29, 2014.

¶ 10. The parties stipulated that husband was current on what they believed was his spousal obligation of $2500 per month from July 2013 through January 2015. Husband paid $600 in spousal support after February 2015, but when the court reinstated the $2916 per month spousal support for July 2013 through October 2014, it found that husband owed wife $6240. There was

4

no evidence before the court that husband was not current with child support payments, but the court's order permitted husband to offset the maintenance overpayment against any child support arrearages due. Wife appealed.

¶ 11. A trial court's decision to award spousal maintenance and its determinations about the amount and form of maintenance are entitled to "wide discretion." Strauss v. Strauss, 160 Vt. 335, 339, 628 A.2d 552, 554 (1993); see also Quesnel v. Quesnel, 150 Vt. 149, 151, 549 A.2d 644, 646 (1988) (explaining that maintenance award must be affirmed unless "there is no reasonable basis to support" it). A maintenance award is proper when the spouse seeking maintenance "lacks sufficient income, property, or both . . . to provide for his or her reasonable needs" and "is unable to support himself or herself through appropriate employment at the standard of living established during the civil marriage." 15 V.S.A. § 752(a)(1)-(2); see also Miller v. Miller, 2005 VT 122, ¶ 14, 179 Vt. 147, 892 A.2d 175 (2005). As we have explained, "[t]he reference to reasonable needs should not be looked at in relation to subsistence" because "[t]he critical comparison is to the standard of living established during the marriage" and the goal of spousal maintenance is to "equalize the standard of living of the parties for an appropriate period of time." Strauss, 160 Vt. at 338, 549 A.2d at 554.

¶ 12. Where, however, a maintenance order ceases to effectively accomplish the goal of equalizing the parties' standards of living, a modification may be appropriate. See Stickney v. Stickney, 170 Vt. 547, 548, 742 A.2d 1228, 1231 (1999) (mem.) ("Orders of support are not final, and may be modified from time to time as circumstances require."). Modification may be appropriate "upon a showing of a real, substantial, and unanticipated change of circumstances," 15 V.S.A. § 758, and the heavy burden for showing a change in circumstances lies with the party seeking a modification. Mayville v. Mayville, 2010 VT 94, ¶ 8, 189 Vt. 1, 12 A.3d 500.

¶ 13.   This Court evaluates whether a change is "substantial" by reference to the context of surrounding circumstances, which may include the parties' current financial situations, the effect of a new spouse's income on the needs and expenses of the obligor, and any reasonable estimates of future income.  Mayville, 2010 VT 94, ¶¶ 8, 15-16.  Additionally, in determining the amount of maintenance in a modification proceeding, the court may properly consider any income available to the obligor from assets distributed as part of the original divorce decree and property award.  Id. ¶ 10.  As with an award of maintenance, a trial court has broad discretion in modifying maintenance and its findings will stand "unless the discretion was erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence."  Taylor v. Taylor, 175 Vt. 32, 36, 819 A.2d 684, 688 (2002).  With those background principles in mind, we address wife's specific allegations of error.

I. Modification of the Maintenance Order and Its "Compensatory Aspect"

¶ 14.   Wife argues that the trial court erred when, after apparently classifying all of her maintenance award as compensatory, it found that husband's inability to pay the award after he lost his job constituted a sufficient change in circumstances and reduced her spousal support to zero.  Husband argues that "[a]n obligor cannot be ordered to pay if a court finds that he lacks the present ability to pay."  Because the trial court did not clearly determine how much of the award was compensatory and did not analyze husband's request for modification of the compensatory aspect of wife's permanent maintenance award using the proper framework for a real, substantial, and unanticipated change of circumstances, we remand for further factual findings.  Specifically, on remand the court must make a finding to determine how much of the award was compensatory in order to clarify whether the permanent award, including its compensatory aspect, is subject to

6

modification under the appropriate change of circumstances considerations and, if so, to what extent.[1]

¶ 15. The maintenance statute, 15 V.S.A. § 752, permits the family court to order two types of maintenance: rehabilitative and permanent.[2] It does not mention compensatory maintenance, and it does not express a preference between rehabilitative and permanent maintenance. Strauss, 160 Vt. at 339, 628 A.2d at 554. The purpose of both forms of maintenance is to correct inequalities in the parties' income and to equalize their standard of living, but they play different roles in achieving that overall goal. See id. at 338, 620 A.2d at 554. In a case where maintenance is appropriate, the court may award rehabilitative maintenance, permanent maintenance, or a blend of the two, as the circumstances of the case warrant. Klein v. Klein, 150 Vt. 466, 476, 555 A.2d 382, 388 (1988). The maintenance statute provides a set of seven

---

[1] In the order that wife appealed to this Court, the trial court noted "that the maintenance award here was characterized as 'compensatory.' " We cannot be certain that the court, in using that language, intended to make a factual finding that the entire permanent award was compensatory in nature. Absent a clear factual finding on that issue, we cannot make a determination about whether and to what extent the award here is subject to modification, given that portions of a permanent award may not be compensatory and are therefore subject to the traditional showing for real, substantial, and unanticipated change of circumstances.

[2] The relevant portion of the statute provides:

(a) In an action under this chapter, the court may order either spouse to make maintenance payments, either rehabilitative or permanent in nature, to the other spouse if it finds that the spouse seeking maintenance:

(1) lacks sufficient income, property, or both, including property apportioned in accordance with section 751 of this title, to provide for his or her reasonable needs; and

(2) is unable to support himself or herself through appropriate employment at the standard of living established during the civil marriage or is the custodian of a child of the parties.

15 V.S.A. § 752(a).

nonexhaustive factors intended to guide the exercise of the trial court's discretion in awarding maintenance: the financial resources of the party seeking maintenance, the property allocated to that party, that party's ability to meet his or her needs independently, the time and expense required for that party to acquire sufficient training or education to enable him or her to find appropriate employment, the standard of living established during the marriage, the duration of the marriage, the age and physical and emotional condition of each spouse, the ability of the spouse from whom maintenance is sought to meet his or her reasonable needs while meeting those of the spouse seeking maintenance, and inflation. 15 V.S.A. § 752(b).

¶ 16.    Rehabilitative maintenance is intended to assist the recipient spouse in becoming self-supporting. Gulian v. Gulian, 173 Vt. 157, 163, 790 A.2d 1116, 1121 (2001). As a result, rehabilitative maintenance—unlike permanent maintenance—is transitional in nature and its hallmark is its "definite time duration." Cleverly v. Cleverly, 147 Vt. 154, 159, 513 A.2d 612, 615 (1986) (when court orders rehabilitative maintenance, it "must impose a time limit"). The most critical factors in a court's decision to order rehabilitative maintenance are "the length of the marriage, the role the [recipient spouse] played during the marriage, and the income the [recipient spouse] is likely to achieve in relation to the standard of living set in the marriage." Strauss, 160 Vt. at 340, 628 A.2d at 554. We afford great deference to the trial court concerning the duration and amount of rehabilitative maintenance and will affirm a trial court's order for rehabilitative maintenance unless there is no reasonable basis to support it. See id.

¶ 17.    However, we have long recognized that in some cases rehabilitative maintenance alone may be insufficient to accomplish the goal of enabling the recipient spouse to support him or herself at the standard of living established during the marriage. See, e.g., Klein, 150 Vt. at 476, 555 A.2d at 388. For example, in Klein, we noted that the trial court's findings would have supported either rehabilitative or permanent maintenance or a mix of both. Id. However, we also

8

acknowledged that in that case, rehabilitative maintenance alone would have been insufficient to meet the goals of maintenance unless the court made a finding on remand that the recipient spouse, who made a "total commitment" to raising the couple's children and as a result failed to develop skills necessary for entry into the working world, would have been able to become self-sufficient at the standard of living established during the marriage. Id. Thus, in cases where the evidence does not support a finding that the recipient of rehabilitative maintenance will be able to support him or herself at the standard of living established during the marriage, an award of permanent maintenance may be appropriate. See id.

¶ 18. Our precedents have provided only limited guidance for trial courts on how to evaluate a request for permanent maintenance or how to decide when one spouse will not be able to become self-sufficient. In order to clarify the distinctions between the two kinds of maintenance and when each is appropriate, it is necessary to begin with an overview of our previous decisions about permanent maintenance, starting with one of this Court's earliest published cases to describe the specific role of permanent maintenance. In that case, Justis v. Rist,[3] we recognized that permanent maintenance traditionally is "an indefinite award that ends with the death of either spouse or the remarriage of the recipient spouse." 159 Vt. 240, 242, 617 A.2d 148, 149 (1992). In adopting the rule that 15 V.S.A. § 752 was not intended to override the common law rule that the death of either party terminates a maintenance award, we reasoned that "because maintenance compensates for the support from future income that would have been available but for the divorce, the right to it ends along with the income-earning capacity of the obligor." Id. at 243, 617 A.2d at 149.

---

[3] We describe Rist only to provide context for the evolution of our decisions concerning permanent maintenance. We recognize that the issue of remarriage of the recipient spouse was not at issue in Rist.

9

¶ 19. We further clarified the role of permanent maintenance in Strauss, 160 Vt. 335, 628 A.2d 552, where we set forth guidelines for determining when permanent maintenance is required as a matter of law. Specifically, we emphasized that the most critical factors in a trial court's decision to award permanent maintenance are "the length of the marriage, the role the [recipient spouse] played during the marriage, and the income the [recipient spouse] is likely to achieve in relation to the standard of living set in the marriage." Id. at 340, 628 A.2d at 534. Moreover, we explained that a permanent maintenance award, unlike a rehabilitative maintenance award, is not time-limited.[4] See id. at 339-40, 628 A.2d at 554 (comparing cases where rehabilitative maintenance and permanent maintenance were appropriate and explaining that rehabilitative maintenance awards are characterized by their limited duration); Rist, 159 Vt. at 243, 617 A.2d at 149 (explaining that word "permanent" in § 752 does not mean never-ending, since right to permanent maintenance ends when either spouse dies or recipient spouse remarries).

¶ 20. We then held that the trial court abused its discretion when it failed to award any permanent maintenance to one of the spouses, who was forty-eight years old at the time of divorce, who had raised the parties' two children and managed the household during their twenty-eight-year marriage, and who—because of her gender, age, and lack of work experience—had limited employment prospects. Id. at 341-42, 628 A.2d at 555-56. We reasoned that although rehabilitative maintenance was essential to help the recipient spouse become self-sufficient, "[i]n a long-term marriage, maintenance also serves to compensate a homemaker for contributions to

---

[4] The parties agreed that the permanent maintenance award would terminate on the date of wife's "full retirement and commencement of drawing pension payments and any social security to which she may be entitled." As a result, we need not decide here whether a trial court could ever order permanent maintenance that is not indefinite without an agreement from the parties. But see Rist, 159 Vt. at 242, 617 A.2d at 149 (explaining that permanent maintenance is "an indefinite award that ends with the death of either spouse or the remarriage of the recipient spouse"); Miller v. Miller, 2005 VT 12, ¶¶ 17, 20, 179 Vt. 147, 892 A.2d 175 (clarifying that remarriage is grounds for modification only if remarriage substantially reduces need for maintenance).

10

family well-being not otherwise recognized in the property distribution." Id. at 338-39, 628 A.2d at 554. That aspect of permanent maintenance, we explained, "is more than a 'rehabilitative function.' " Id. at 339, 628 A.2d at 554.

¶ 21. That same year, in Delozier v. Delozier, we took up the question of the weight trial courts should afford to the various factors we identified in Strauss, and specifically, to the importance of the length of the marriage. 161 Vt. 377, 640 A.2d 55 (1994). We explained that in a trial court's decision on a request for permanent maintenance, "[t]he length of the marriage is particularly important not only because it is often a major factor creating the disparity in the parties' earning capacities," but also because "regardless of the spouses' respective roles" the length of the marriage "provides a benchmark for determining reasonable needs." Id. at 382, 640 A.2d at 58. In other words, the length of the marriage is important because it impacts the trial court's "measurement of reasonable needs and the length of time the maintenance award is required to maintain the recipient spouse at that level." Id. at 383, 640 A.2d at 58.

¶ 22. Thus, it is clear from our precedents that permanent maintenance is appropriate in long-term marriages where the court finds that one spouse will not be able to become self-sufficient and is aimed at equalizing the parties' standards of living in reference to the standard of living established during the marriage. See Gravel v. Gravel, 2009 VT 77, ¶ 24, 186 Vt. 250, 980 A.2d 242. Rehabilitative maintenance, in comparison, is appropriate when the court finds that one spouse requires time-limited support to enable him or her to become self-sufficient. See id. ¶ 20. Both types of maintenance are modifiable when the factors that justified the original imposition of the award have dissipated or changed, and both have two components: duration and amount. See Chaker v. Chaker, 155 Vt. 20, 25, 581 A.2d 737, 740 (1990). However, our case law has not yet answered the central question at issue in this appeal: does a trial court have the discretion to reduce to zero a permanent maintenance award that appears to be purely compensatory in nature?

11

¶ 23.    Our analysis begins with the concept of "compensatory maintenance."  It is clear from our precedents that compensatory maintenance is not an independent, judicially created category of maintenance but is instead a component of many permanent maintenance awards that is appropriate primarily in long-term marriages.[5]  Cf. Stickney, 170 Vt. at 549, 742 A.2d at 1232 ("[I]n a long-term marriage, maintenance awards serve to compensate the homemaker for contributions to family well-being not otherwise recognized in the property distribution."); Klein, 150 Vt. at 474, 555 A.2d at 387 (explaining that one purpose of permanent maintenance is to recompense for contributions to family's wellbeing that were not otherwise accounted for and emphasizing that most important factor is length of marriage).  We have never clearly defined compensatory maintenance, but we have characterized the "compensatory aspect" of permanent maintenance as

> reflect[ing] the reality that when one spouse stays home and raises the children, not only does that spouse lose future earning capacity by not being employed or by being underemployed subject to the needs of the family, but that spouse increases the future earning capacity of the working spouse, who, while enjoying family life, is free to devote productive time to career enhancement.

---

[5]  We first used the term "compensatory maintenance" in Stickney, 170 Vt. at 549, 742 A.2d at 1231-32.  Our case law initially recognized that compensation was one of the purposes of a maintenance award.  Klein, 150 Vt. at 474, 555 A.2d at 387.  Thus, while we have occasionally referred to an award of maintenance based in whole or part upon the recipient spouse's household contributions as "compensatory maintenance," see, e.g., Meyncke v. Meyncke, 2009 VT 84, ¶ 13, 186 Vt. 571, 980 A.2d 799 (mem.), in reality when there is a compensatory component to a maintenance award, it is properly characterized as an aspect of permanent maintenance rather than an independent category of maintenance.  When a court considers whether to award permanent maintenance with a compensatory aspect, the most important factor continues to be the length of the marriage.  See Klein, 150 Vt. at 474, 555 A.2d at 387.  That factor, however, should not be outcome-determinative, and there may be rare cases where a permanent maintenance award with a compensatory aspect would be appropriate even following the dissolution of a shorter-term marriage.

Delozier, 161 Vt. at 382, 640 A.2d at 57-58.[6]  The theory behind the compensatory aspect of maintenance, then, is the recognition that some marriages can include circumstances analogous to a contractual bargain: the obligor spouse agrees to contribute to the marriage and family by pursuing a career outside the home and bringing the fruits of that career to the family, while the recipient spouse agrees to contribute to the marriage by foregoing possible career pursuits and devoting that time and energy to caring for or supporting the home and family, enabling the other spouse to achieve the potential for greater success in the workplace.  A permanent award with a compensatory component is an attempt to continue to enforce that bargain because the obligor spouse, through the growth of a career, continues to benefit from the marital bargain after the marriage has dissolved.  So long as the obligor spouse is reasonably able to capitalize on the bargain, compensatory maintenance may be justified to give both parties the benefit of the marital arrangement.

¶ 24.  For example, where one spouse made contributions to the family unit—such as child care or homemaking—that made it possible for the other spouse to achieve greater success in the working world—say as a doctor—those contributions survive the dissolution of the marriage and, unlike property, cannot be divided between the spouses.  The recipient spouse's household contributions during the obligor's spouse's medical school, internships, and early years of practice are not a guarantee of uninterrupted success as a doctor.  But so long as the doctor retains the opportunity for increased earnings—an opportunity enabled, in part, by the homemaker's marital contributions—the doctor continues to benefit from those contributions.

¶ 25.  Keeping with that understanding of compensatory awards, we have recognized that "[i]n determining the extent of the compensatory component of a maintenance award, the family

---

[6]  Another common scenario giving rise to a compensatory maintenance claim is where one spouse works to support the family while the other spouse is in school earning a specialized degree, such as a medical degree.  See, e.g. Stickney, 170 Vt. at 549, 742 A.2d at 1232.

court should give particular consideration to the role of the recipient spouse during the marriage and to the length of the marriage." Id. (citation omitted). Thus, while all maintenance with a compensatory purpose is permanent maintenance, not all permanent maintenance is necessarily compensatory; it is possible that a recipient spouse could establish a need for permanent maintenance based on the length of the marriage and the inability of that spouse to obtain skills and experience to meet reasonable needs, even if the spouse offered no evidence of having made the kinds of household contributions or personal sacrifice that would justify a compensatory component to the permanent award.

¶ 26. Several consequences flow from this clarification of the compensatory aspect of permanent maintenance. First, all maintenance, whether rehabilitative or permanent, is subject to modification based upon a showing of real, substantial, and unanticipated change of circumstances. 15 V.S.A. § 758 ("On motion of either party and due notice, and upon a showing of a real, substantial, and unanticipated change of circumstances, the court may from time to time annul, vary or modify a judgment relative to maintenance . . ."). And because there are no fixed standards for determining what meets this threshold, courts must evaluate any alleged change in circumstances in light of the nature of the original maintenance award. See Miller, 2005 VT 122, ¶¶ 15-16. In other words, where the original maintenance award was permanent in nature and was intended, at least in definable part, to compensate for a recipient spouse's nonmonetary contributions that benefitted the obligor spouse beyond the marriage, the obligor spouse must make a showing that he or she is no longer able to benefit from the recipient spouse's contributions because of a change in circumstances in order to justify a downward modification of the compensatory aspect of the permanent award.

¶ 27. Second, a change in financial circumstances—absent a showing that the change is the product of unanticipated, external factors—will rarely, if ever, support a downward

14

modification to zero of the compensatory portion, if any, of a permanent award. Cf. id. ¶ 20 (reasoning that financial improvement resulting from remarriage of former spouse "cannot alone be changed circumstances" sufficient to modify maintenance award because "[m]aintenance recipients should normally retain the benefit of actions they take to live more economically"); Meyncke, 2009 VT 84, ¶ 13 (noting that "there is a limit to the extent that changes in financial circumstances can support downward modification of a compensatory maintenance award" and that "there is a limit to the extent that a reduction in the recipient spouse's expenses can justify downward modification"). This conclusion is consistent with our prior decisions, which have made clear that an obligor's inability to pay is only a valid consideration if the trial court finds that the obligor did not voluntarily render him or herself unable to pay. See Wardwell (Clapp) v. Clapp, 168 Vt. 592, 594-95, 720 A.2d 862, 864 (1998) (mem.) (collecting cases and concluding that "inquiry necessarily focuses on—and indeed begins with—the obligor's subjective intent in making the change"). Thus, for example, the obligor doctor who suddenly becomes unable to practice medicine because of an unexpected medical condition that removes her vision or the obligor machinist whose career is suddenly terminated with the advent of a new technology that moots his specialized work could be entitled to a downward modification. On the other hand, the obligor doctor who is fired because she is perpetually late would not be entitled to a downward modification. Cf. Ellis v. Ellis, 262 N.W.2d 265, 268 (Iowa 1978) ("When a person's inability to pay alimony or child support is self-inflicted or voluntary, it will not constitute a ground for reduction of future payments."); Wheeler v. Wheeler, 548 N.W.2d 27, 31 (N.D. 1996) (declining to downwardly modify spousal obligation where obligor voluntarily took early retirement ostensibly to cope with health problems because obligor "voluntarily retired long before" learning of health and, given obligor's age, health problems were foreseeable); Grahovac v. Grahovac, 680 N.W.2d 616, 622 (Neb. Ct. App. 2004) (declining to downwardly modify spousal obligation where

obligor was "fired for excessive drinking" and where court classified obligor's reduction in income as "waste and dissipation of one's talents and abilities"). If the potential benefit to the obligor remains, but the obligor has lost his or her current ability to pay the compensatory portion of the award, that portion of the maintenance debt accrues. In addition, it is important to note that while the compensatory aspect of a permanent maintenance award may not have a defined termination date, the compensatory aspect of the initial award should reflect, to the extent possible, the actual bargain the parties intended.

¶ 28. A related analysis applies to the modification of the compensatory aspect of permanent maintenance. While a real, substantial, and unexpected change of circumstances is the threshold test for modification of all aspects of maintenance, what is necessary to satisfy that test concerning the compensatory component of a permanent maintenance award is more stringent and requires showing more than just an unexpected change in financial circumstances. The compensatory portion of a permanent maintenance award is not subject to downward modification unless the trial court makes an additional affirmative finding that an unexpected change has rendered the obligor spouse no longer able to potentially reap the benefits of the recipient spouse's contributions to the marriage which triggered the compensatory portion of the permanent award.

¶ 29. Here, when the trial court crafted the parties' original maintenance award, it indicated that the award included a compensatory aspect because "[husband] wouldn't be doing as well as he is doing unless [wife] was the primary caregiver for the children." The court did not, however, explicitly indicate what percentage of the permanent award was intended to compensate wife for her contributions to the marriage. Nevertheless, when the court later considered husband's motion to modify the maintenance award based on changed financial circumstances, it seemed to reclassify the entire permanent award as compensatory and nonetheless reduced it to zero. The court's determination that a change in the obligor spouse's financial circumstances alone was a

16

sufficient basis to establish a change in circumstances for the compensatory aspect of the maintenance award was error. The court did not take into account the bargain that the parties reached when they married and decided that wife would forego then-available career opportunities in order to raise the couple's children. Husband's inability to pay is relevant to the compensatory aspect of his spousal maintenance obligation only if he can make an affirmative showing that he can no longer reap the benefits of that marital bargain because he is unable to work or because he has reached a reasonable age of retirement such that his income is no longer the result of that bargain. Thus, on remand, the court may modify the compensatory aspect of the award only upon an affirmative finding that husband's inability to pay was the product of an unexpected change that rendered him unable to reap the benefits of wife's contributions to the marriage. If husband retains the benefit of his aspect of the marital bargain, increased earning potential in part related to wife's contributions for which she is receiving a compensatory component of permanent maintenance, then wife is entitled to her portion of the bargain. Thus, husband's obligation for the compensatory payment remains and his current inability to pay it means a debt to wife accrues for the unpaid portion of maintenance which is compensatory in nature.

¶ 30. Because the necessary showing for changed circumstances for the compensatory portion of permanent maintenance is more exacting, when a court orders permanent maintenance and a portion of the permanent award is intended to compensate the recipient spouse for contributions made during marriage, the court should identify what portion of the permanent award is made on that basis. Here, the court was unclear about what portion of the maintenance award was compensatory. And because the court granted husband's motion to modify the compensatory award based solely on the its finding that husband had experienced a change in financial circumstances that rendered him unable to pay the award, remand is necessary. Some portion of the award may be modifiable based upon change of financial circumstances alone, but our case

17

law makes it clear that where there is a compensatory aspect of a maintenance award more than a change in financial circumstances is necessary to reduce the award to zero.

## II. Disclosure of Financial Information from Current Spouse

¶ 31. Wife argues that the trial court erred when, in the course of granting husband's motion for downward modification of his maintenance obligation, it declined to account for husband's current wife's subsidy of his living expenses. We agree.

¶ 32. In an initial order setting the amount of maintenance, a court must consider, among other things, "the financial resources of the party seeking maintenance," the standard of living established during the marriage, and "the ability of the spouse from whom maintenance is sought to meet his or her reasonable needs while meeting those of the spouse seeking maintenance." 15 V.S.A. § 752(b). The court has discretion to modify the original award "upon a showing of a real, substantial, and unanticipated change of circumstances," 15 V.S.A. § 758, and the heavy burden for showing a change in circumstances lies with the party seeking a modification. Mayville, 2010 VT 94, ¶ 8. This Court evaluates whether a change is "substantial" by reference to the context of surrounding circumstances, id. ¶¶ 15-16, and substantial and unanticipated changes to the obligor spouse's available income can be a change in circumstances sufficient to warrant modification. Taylor, 175 Vt. at 38, 819 A.2d at 689.

¶ 33. Additionally, when an obligor spouse remarries, the court may consider that spouse's present financial obligations to determine their ability to meet reasonable needs, but the court "may not impute the income of the new spouse to the obligor for the purposes of calculating the amount of the obligor's income that is available to pay maintenance." Mayville, 2010 VT 94, ¶ 16. Put differently, "the court may consider the effect that the new spouse's income has on the needs and expenses of the obligor." Id. This rule of law runs parallel to our rulings in cases where the recipient spouse's remarriage results in decreased expenses, which we have held may be a

18

sufficient ground to warrant a downward modification to the obligor's maintenance payment.[7] Id.; see also Miller, 2005 VT 122, ¶¶ 17, 20 (holding that remarriage of recipient spouse is grounds for modification only if remarriage substantially reduces need for maintenance while recognizing that "sharing of household expenses may produce some measure of financial improvement because some of those expenses are not directly proportional to the number of household occupants").

¶ 34.    The facts of our decision in Mayville are instructive.  There, the court's final divorce order adopted an agreement between the parties under which one spouse was to pay the other a set sum of money until the obligor turned sixty-five years old.  2010 VT 94, ¶ 2.  The obligor eventually remarried and when he unexpectedly lost his job by no fault of his own, this Court noted the trial court's finding that he "made little effort to seek new employment," in part because his new spouse contributed to a reduction in his household expenses.  Id. ¶¶3-4.  The obligor filed a motion to terminate maintenance payments, and the court reduced them but did not terminate the maintenance order.  Id. ¶ 6.  On appeal, the obligor argued that the trial court erred by, among other things, considering the earnings of his new spouse in setting the level of the modified maintenance payments.  Id. ¶ 16.  We disagreed and reaffirmed our prior decisions establishing that "a trial court may properly consider the earnings of a new spouse to determine 'the ability of the spouse from whom maintenance is sought to meet his or her reasonable needs

_____

    [7] We acknowledge that in both circumstances—where the recipient's remarriage reduces household expenses or where the obligor's remarriage increases household income or decreases household expenses—a rule that permits the trial court to consider a new spouse's income could invite abuse by an ex-spouse seeking to constantly review a new spouse's finances.  However, the potential for that abuse is mitigated by the fact that the new spouse's income is relevant only to a determination of reasonable needs.  Thus, before the court examines the new spouse's income, it must find that there has been an unanticipated change of circumstances that triggers further inquiry into the relative financial positions of the former spouses.  In other words, only where the spouse seeking modification meets the high burden of showing changed circumstances will the court examine a new spouse's income, and the difficulty of meeting that high standard constrains the potential for abuse.

19

while meeting those of the spouse seeking maintenance,' " so long as the court does not impute the new spouse's salary to the obligor. Id. (quoting 15 V.S.A. § 752(b)(6)).

¶ 35. The same is true in this case. Here, as in Mayville, husband sought to modify his maintenance obligation on the basis that his unexpected loss of employment constituted a real, substantial, and unanticipated change in his financial situation. Like in Mayville, the surrounding circumstances include husband's remarriage and the impact remarriage had on his financial circumstances. Thus, we agree with husband that it would have been improper for the trial court to "impute the current wife's salary to husband or require the current wife to pay part of her husband's maintenance obligations." Mayville, 2010 VT 94, ¶ 16. Nevertheless, we agree with wife that the trial court here erred when it considered the expenses that husband has incurred as a result of his remarriage but concluded that it could not also consider the financial assistance his new wife has provided insofar as that assistance impacts his ability to meet his reasonable needs while also meeting wife's reasonable needs.

¶ 36. Specifically, the court found that husband and his current wife had an agreement under which they split household expenses evenly. Husband had been unable to pay his share, forcing his current wife to pay a disproportionate amount of their household bills relative to their agreement. The trial court found this agreement created "an ever deepening obligation" between husband and his current wife. As a result of this agreement, the trial court, over wife's objection, confined testimony concerning the new spouse's income only to the question of whether she had the ability to pay her agreed-upon share of household expenses. It did not examine current wife's ability to make up the deficit created by defendant's inability to pay his "share." This was error.

¶ 37. The evidence showed husband and his new spouse lived together and incurred joint household expenses. Consequently, any agreement between them concerning responsibility for those expenses within their household was merely that: an agreement between them. Any

20

allocation of responsibility for a mutual household expense is of no moment to the person sending the bill. The grocery store, for example, does not allow the shopper to pay only half of the bill because the parties consuming the groceries have allocated responsibility for the bill between them in that proportion. Here, the parties were married, lived together, and shared household expenses. Regardless of any internal agreement on household expense allocation, the wife's income was potentially available to meet the household expenses and the trial court here found that her income was being used to meet those expenses beyond what she had agreed to pay. Consistent with Mayville, the court should have taken into account husband's new wife's income to the extent that it affected his expenses and ability to support himself while paying maintenance. 2010 VT 94, ¶ 16. To hold otherwise would allow an obligor spouse who remarries to prevent or shape inquiry into the successor spouse's income based solely on a nonbinding, extralegal agreement between the new spouse and the obligor spouse, and that would, in turn, allow the obligor to preference debt to a new spouse over a legally binding obligation to the recipient spouse. On remand, the court should allow wife to discover husband's new wife's income, not to impute it to husband's maintenance obligation, but for the purpose of determining his overall financial situation.

### III. Maintenance Offset Against Child Support

¶ 38. In light of the remand, one further issue remains for our consideration. When the trial court reduced husband's maintenance obligation to zero, it made the order retroactive to October 29, 2014. The result was that, under the court's order, husband had overpaid at least $8100 in spousal support. The court's order allowed husband to offset this overpayment against an arrearage he owed to wife for unpaid spousal maintenance prior to October 2014 and also against any unpaid child support arrearages. Although this issue is not certain to arise on remand, we reach it because it is possible that the court will find that husband has overpaid maintenance and will again enter an order allowing an offset against unpaid child support arrearage. To do so

21

would be error, and that is no less the case where, as here, any arrearage in child support payments would be for children who have since reached adulthood. To the extent Meyncke v. Meyncke, 2013 VT 82, 194 Vt. 556, 82 A.3d 585 (2013) (Meyncke II) suggests otherwise, we overrule it.[8]

¶ 39. While the spousal maintenance and child support obligations in this case were both payments that husband owed to wife, the payments served entirely different purposes, were governed by different statutory regimes, and were not interchangeable. Spousal maintenance is intended to provide for the recipient spouse's own needs, not the needs of the parties' children, and a maintenance order therefore takes into account only the circumstances relevant to the obligor and recipient. Gulian v. Gulian, 173 Vt. 157, 163, 790 A.2d 1116, 1120-21 (2001). Child support, however, "does not involve only the parent required to make such payments and the custodial parent entitled to receive them." Lyon v. Lyon, 143 Vt. 458, 462, 466 A.2d 1186, 1189 (1983). Rather, child support payments "are made for the support, maintenance and education of the minor children of the parties. The rights of such children are to be served and protected." Id. Specifically, while spousal maintenance is aimed at equalizing the parties' standard of living, see infra, Part I, child support is "based on the concept that children should receive the same proportion of parental income after separation or divorce of their parents as they would receive if their parents were living together in one household." 15 V.S.A. § 654.

---

[8] In Meyncke II, a wife owed a husband child support arrears, while the husband owed the wife maintenance arrears. 2013 VT 82 ¶ 46. The wife argued on appeal that the trial court erred when it declined to rule on her request to offset her child support arrears against the husband's spousal maintenance arrears. Id. Without explanation and with only a citation to a decision from an intermediate appellate court in Ohio, we explained that because "wife owes the child support to husband rather than the state" and because "the parties' child has reached the age of majority, we see no reason for the superior court on remand not to make an equitable offset." Id. (citing Schumann v. Schumann, 2010-Ohio-5472, ¶ 47, 944 N.E.2d 705 (Ct. App.)). For the reasons explained in Part III of this decision, we conclude now that there is good reason why trial courts must not make equitable offsets when one of the debts owed is child support arrearages, even as we acknowledge that the trial court may have discretion to permit offsets of other forms of debt arising out of the dissolution of a marriage.

22

¶ 40. We have recognized the special nature of child support in several prior decisions. See, e.g., Gulain, 173 Vt. at 164, 790 A.2d at 1121 (describing complex federal-state partnership created to enforce child support orders); Lyon, 143 Vt. at 462, 466 A.2d at 1189 (explaining that in child support cases, children's "welfare is paramount"). Our cases have sought to protect children against loss of child support as a result of action or inaction by the recipient parent, and a failure of the recipient spouse to seek enforcement of a child support order or to reduce arrearages in a timely fashion therefore cannot result in a waiver of the child support payment. Lyon, 143 Vt. at 462, 466 A.2d at 1188-89. Similarly, we do not permit parents to waive arrearages of child support on behalf of the child, St. Hilaire v. DeBlois, 168 Vt. 445, 448, 721 A.2d 133, 136 (1998), nor do we permit them to waive an initial child support order. Bergman v. Marker, 2007 VT 139, ¶ 13, 183 Vt. 68, 944 A.2d 265 ("[T]he child's right to child support cannot be waived by a parent's action or inaction."). Parties to a divorce cannot, by stipulation, withdraw the interests of their children, who are not parties to the contract, from the continuing jurisdiction of the court. White v. White, 141 Vt. 499, 503, 450 A.2d 1109, 1110 (1982). These decisions underscore the paramount importance that our society places upon the support and care of children through child support obligations, a policy codified in Vermont in 15 V.S.A. § 650.

¶ 41. It is also worth noting the differences in the circumstances and manner in which the statutory schemes governing child support and spousal maintenance guide the trial court's discretion. Child support is a necessary element of every divorce or separation with children, reflecting the strong "public policy that parents have the responsibility" to care for their children. 15 V.S.A. § 650. The Legislature saw fit to give that public policy practical force through the use of child support guidelines. Id. § 654. The total support obligation is presumed to be the amount of child support needed unless the court finds the application of the guidelines to be unfair. Id. § 659. Maintenance, however, is calculated in the court's discretion by applying statutory factors

23

if the court finds any entitlement to maintenance has been established. And unlike in spousal support cases, a third party other than the parents of a child who is the subject of a support order may seek or enforce a child support obligation. Id. § 658(b) ("A request for support may be made by either parent, a guardian, or the Department for Children and Families or the Department of Vermont Health Access, if a party in interest.").

¶ 42. There is no reason to assume that the character of a child support obligation that is in arrears changes when the target children become adults; a delay in child support payment does not transform its purpose or obviate the need to make it for the benefit of the children, not the ex-spouse. On remand, the court must make a finding of whether wife has received more for her support than husband was obligated to pay. Regardless of that determination, the children have received less for their support, through payments to the recipient spouse, than they were entitled. Allowing monies paid to wife for her support to be offset against monies to be paid to her on behalf of the parties' children for their support ignores the vastly different purpose of the payments and wrongly focuses only on the commonality of the initial recipient. See Steffens v. Peterson, 503 N.W.2d 254, 260 (S.D. 1993) (noting that "child support and alimony are distinct concepts with different intended beneficiaries" and concluding that "[r]educing child support payments to compensate for an overpayment of alimony equates to 'robbing Peter to pay Paul' "). Because they serve different purposes and are intended to benefit different people, a court may not offset a maintenance overpayment against either past or future child support obligations.

Reversed and remanded.

FOR THE COURT:

_____

Associate Justice

24